IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| **REGINALD FRANKLIN, III,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | |
| | § | **EP-11-CV-413-KC** |
| **RICK THALER, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent**. | § | |

## ORDER

On this day, the Court considered a Petition for Writ of Habeas Corpus, ECF No. 1, filed

pro se by Petitioner Reginald Franklin, III ("Franklin") under 28 U.S.C. § 2254 in the above-

captioned case.  For the reasons set forth below, Franklin's Petition is **DENIED**.  Additionally,

the Court concludes that Franklin is **DENIED** a certificate of appealability.

## I.        BACKGROUND

In his Petition, Franklin challenges his conviction in *State v. Franklin*, No. 20070D05639

(120th Dist. Ct., El Paso County, Tex., Aug. 14, 2008).  Before considering each of Franklin's

arguments, the Court first provides an overview of the events of Franklin's trial, Franklin's

appeal before the Eighth Court of Appeals in *Franklin v. State*, No. 08-08-00274-CR (Tex. App.

July 28, 2010), and Franklin's subsequent post-conviction proceedings in state court.

### A.        Franklin's Trial

On December 11, 2007, Franklin was indicted for an assault causing bodily injury to a

family member, Maria Yslas, whom Franklin allegedly strangled with his hands on or about

November 5, 2007.  *See* Tr. Vol. 3, at 6-8.  Franklin's jury trial for this offense began the

1

following year in August 2008.  *See id.* at 1.  After jury selection was completed, prosecutors for the State of Texas began the merits phase of Franklin's trial on August 12, 2008, by reading the indictment to the jury and presenting an opening argument.  *Id.* at 6-15.  In the State's view, the evidence in this case would demonstrate that Franklin had strangled Yslas, with whom Franklin was in a long-term dating relationship, when Franklin and Yslas were staying together in a studio apartment belonging to Franklin's friend, Raymond Reskey, on the night of November 5, 2007.  *Id.* at 10-11.  One of Franklin's attorneys also gave an opening argument, in which he argued that the evidence would show that the only "physical contact" between Franklin and Yslas in Reskey's apartment on the night of November 5, 2007, constituted "consensual sex," and that "any fresh red marks" subsequently observed on Yslas's neck were actually "hickeys" that Franklin had given her.  *Id.* at 15-17.

During opening arguments, the attorney for the State made a reference to Franklin's previous conviction for assault causing bodily injury to a family member in 2006:

> So the first piece of evidence that the State will give you is what's called a 'stipulation.'  That's just an agreement that's entered into by the defendant by and through his attorney with the State of Texas—that's us as the prosecutors—that tells you that the defendant, Reginald Franklin, who's on trial today for assault family violence enhanced, is one and the same Reginald Franklin who was previously convicted of assault family violence on September 19th of 2006.

*Id.* at 9.  A reference to this previous offense was also included in the indictment.  *See id.* at 7.  The State's attorney told the jury that Franklin's stipulation was "only for you to consider for jurisdictional purposes alone . . . . [I]t's just a means by which we get to try this case here today as a felony."  *Id.* at 9.  Franklin's attorney made no objection to this argument.  *See id.*

### 1.      Testimony by Officer Vega and Officer Clifford

Over the next two days, the State called six witnesses.  First, Officer Amanda Marie Vega

2

testified about her initial meeting with Yslas on November 6, 2007, the day after the alleged assault at Reskey's apartment.  *Id.* at 22-52.  Officer Vega also testified regarding the red marks she found on Yslas's neck and characterized them as "impressions . . . [o]f a hand.  And you could see fingertips on the end of, like, the sides of the neck."  *Id.* at 36.  Officer Vega also testified that she was "certain" that these marks "were not hickeys."  *Id.* at 35.

As Officer Vega explained, however, no photographs of Yslas's injuries could be offered into evidence.  Officer Vega had taken digital photographs of Yslas's injuries on November 6, 2007, but these photographs were subsequently lost during their transfer from the digital camera to a computer at the regional command center.  *Id.* at 38-43, 72.  Officer Vega testified that, ordinarily, after moving any digital images from the camera's memory card to the regional command center's computer, the images are deleted "from the memory card so the next officer can use it without having difficulties with too many pictures."  *Id.* at 43.  In this instance, however, Officer Vega testified that she was "unable to locate" the images on the command center's computer after she had deleted them from the camera.  *Id*.  Officer Vega admitted that she lacked "any explanation for what happened" to the images.  *Id.* at 44.

The second witness, Officer Jeffrey Martin Clifford, testified regarding Franklin's subsequent arrest on November 6, 2007, at a nearby convenience store, and his meeting with Yslas shortly thereafter in a patrol car outside Reskey's apartment.  *Id.* at 52-86.  Like Officer Vega, Officer Clifford also testified that the marks on Yslas's neck were not hickeys, because they "were long, straight lines," similar to "fingers" forming a "V pattern."  *Id.* at 77.

### 2.   Testimony by Raymond Reskey

A third witness, Raymond Reskey, testified that he had permitted Franklin and Yslas to stay in his studio apartment on the night of November 5, 2007, that he had also slept in the same

room with Franklin and Yslas during that night, and that he had observed several arguments and a physical struggle between them. *Id.* at 86-161.  According to Reskey, he had watched Franklin attack Yslas in his apartment, after which Franklin immediately "got off of her," "told her to write a letter," and "told her what to put in the letter." *Id.* at 117-25.  Reskey testified that Franklin then kept the letter and put it "back in his personal goods." *See id.* at 123.  As Reskey was describing what Franklin had told Yslas to write in the letter, Franklin's attorney objected as to hearsay. *Id.* at 117-18.  After a bench conference, the trial court overruled this objection under the exception for admissions by a party-opponent. *Id.* at 121-22.

This letter was entered into evidence during Reskey's testimony as State's Exhibit 10. *Id.* at 129.  The letter stated, "I filed false charges again[st] Reginald Franklin while I was under the influence of alcohol and prescription drugs.  He never done anything to me.  I wish to apologize to the El Paso Police Department for filing false charges," and was signed, "Maria Yslas." *Id.* Vol. 6, Ex. 10.  Other than the date of the letter, November 6, 2007, the letter gave no indication as to when Yslas had supposedly filed false charges or what she had falsely charged Franklin with doing. *See id.*

Later in the trial, one of Franklin's attorneys argued that this letter referred to a separate offense that had occurred prior to the alleged strangling. *See id.* Vol. 3, at 202.  That is, when the letter was written on November 6, 2007, Yslas "hadn't filed any charges" yet that were related to the strangling, as Franklin's attorney explained to the trial court outside the hearing of the jury. *See id.* at 119.  Franklin's attorney therefore suggested that the "charges" referenced in the letter were related to an extraneous offense, and unrelated to the alleged strangling on November 5, 2007. *Id.*  At the time when the letter was entered into evidence as State's Exhibit 10, however, Franklin's attorney did not make any explicit objection regarding the prejudicial effect of

4

references to a possibly extraneous offense.  *See id.* at 119-22.  The only explicit objection made

to the admission of the letter or Reskey's testimony about the letter was the hearsay objection,

which the trial court overruled.  *See id.* at 117-22.

Reskey also told the jury that he suffered from schizophrenia with a manic-depressive

nature and obsessive-compulsive disorder.  *Id.* at 87-88.  Reskey explained that he had taken

medication for these disorders "religiously" for forty-eight years.  *Id.* at 132-33.

### 3.    Testimony by Maria Yslas

Fourth, the State called Yslas herself to the stand, and she testified regarding her

longstanding romantic relationship with Franklin, her history of mental health problems, and her

recollection of the events at Reskey's apartment on November 5, 2007.  *Id.* at 166-274.

According to Yslas, she and Franklin "started arguing and . . . got into a fight" that evening,

during which Franklin became violent and "started choking" Yslas with his hands.  *Id.* at 189-93.

Yslas also testified that she suffered from alcoholism and depression.  *Id.* at 174-75.  She

explained that she had taken medication for her depression every day for almost a year, although

she had forgotten the name of her depression medication.  *Id.* at 176-77.  She denied having any

other mental illnesses.  *Id.*

Yslas also testified regarding the letter she had written after the violent altercation,

State's Exhibit 10, and stated that Franklin had told her precisely what to put in the letter.  *Id.* at

200.  She testified that Franklin "was writing it down and told [Yslas] to copy what he was

writing."  *Id*.  Yslas then testified that Franklin told her to take the letter to Franklin's attorney.

*Id.* at 201.  At this point, Franklin's attorney objected that this testimony was an "insinuation"

that other, distinct "charges [were] out there pending against this defendant," because "this

woman, otherwise, would not have known" who Franklin's attorney was on November 6, 2007.

5

*Id.* at 201-02.  Although the letter had already been admitted into evidence during Reskey's earlier testimony, Franklin's attorney also now stated during a bench conference that "[i]t's bad enough putting the letter [into evidence], which basically alleges an extraneous offense."  *Id.* at 202.  As Franklin's attorney argued explicitly at this time, "the letter talks about that 'I've filed charges on the 6th,' but she has supposedly not filed any charges.  Therefore, it's already making a reference about extraneous offenses."  *Id.* at 203, 205.

The trial court found, however, that this letter referred prospectively to charges that had not yet been filed, and that this letter was therefore written in "anticipation" of charges that Yslas might have later filed against Franklin in relation to the alleged strangling on November 5, 2007. *See id.* at 119, 203.  In the trial court's view, "[b]ased on the testimony that [had been] heard" at Franklin's trial, the letter was a preemptive measure that did not refer to any extraneous offense. *See id.* at 119, 205-06.

A second letter was also briefly discussed at trial, and was entered into evidence as State's Exhibit 18.  *Id.* at 207-12.  Yslas wrote this second letter to Franklin nearly two years prior to the alleged strangling incident.  *See id.* at 210-12.  This letter was offered only as an example of "words that [Yslas] would use" ordinarily, in order to demonstrate that the phrases used in the first letter, State's Exhibit 10, were the result of Franklin's compelling Yslas to write formally.  *See id.* at 208, 212.

On cross-examination, Franklin's attorney then attempted to impeach Yslas's credibility on various grounds.  In particular, Franklin's attorney asked Yslas about a Non-Prosecution Affidavit that she had signed on January 30, 2008.  *Id.* at 221-22, 239; *id.* Vol. 6, Ex. 19.  In this document, which was introduced as State's Exhibit 19, Yslas stated:

I want to advise the District and County Attorney's Offices of El Paso County,

> Texas, that I do not want to press charges against the defendant, REGINALD
> FRANKLIN.  On the contrary, I believe justice will better be served if all charges
> arising out of this transaction are dismissed, and it is my desire the El Paso
> District Attorney's Office dismiss all of said charges pending against the
> defendant.
>
> At this time, I would like to withdraw the charges.  I further want to state under
> oath that REGINALD FRANKLIN did not strike or hit me or choke me in any
> fashion on November 5, 2007.  Due to my intoxication and mental condition, I
> have accused Reginald of hurting me when he has only tried to help me.

*Id.* Vol. 6, Ex. 19.

Yslas confirmed that she had signed the Non-Prosecution Affidavit on January 30, 2008.  *Id.*

Vol. 3, at 228-29.  During cross-examination, Yslas also testified that "what's contained in

State's Exhibit 19" was "the truth."  *Id.* at 230.  This statement contradicted Yslas's earlier direct

testimony, in which she had stated that the Non-Prosecution Affidavit was not true and that she

had signed it only "[t]o defend him, like always."  *See id.* at 226.

One of Franklin's attorneys asked Yslas whether she had previously made an oral

statement that she had accused Franklin of assault only because she was a "psychiatric patient"

who would "drink and use drugs," but Yslas denied ever making such a statement.  *Id.* at 239.

Franklin's attorney also asked whether Yslas had ever seen a psychiatrist or psychologist, which

Yslas initially denied before recalling that she had in fact received counseling from Dr. Alvaro

Samaniego in the past.  *Id.* at 241-43.  Franklin's attorney then asked Yslas about a statement she

had made to Michael Gus McGee, a mental health caseworker, during her scheduled meeting

with him on the morning of November 6, 2007.  *Id.* at 246-47.  Franklin's attorney asked

whether Yslas had been crying when she spoke with McGee, which Yslas affirmed, and whether

she "told him that [she] was afraid of [her] sister," which Yslas denied.  *Id.*  After the State's

objection, however, the trial court ruled during a bench conference that Franklin's attorney could

not ask Yslas any further questions about "what they discussed" during her sessions with

McGee, because "to go into their meeting and their conversations" was a violation of "a definite patient right." *Id.* at 247-48.

At this time, Franklin's attorney attempted to draw the jury's attention to two previous incidents earlier in 2008. According to statements made by Franklin's attorney during a bench conference, Yslas had previously made false accusations of assault against Franklin and a second individual, Sonny Gardea. *See id.* at 250-61. However, pursuant to a pre-trial ruling by the trial court on the State's motion in limine, Franklin's attorney was first required to put any such questions to Yslas outside the presence of the jury so that the trial court could rule on the admissibility of these questions and Yslas's answers. *See id.*

During this brief hearing, Franklin's attorney first asked Yslas about an incident on February 22, 2008. *Id.* at 252-53. According to medical records, Yslas had apparently told employees at Thomason Hospital that she had been attacked in a bar the previous night. *Id.* Franklin's attorney then questioned Yslas about a conversation with her neighbor, Naim Walid, the same day, during which Yslas allegedly blamed the same injuries on Franklin, even though Franklin was actually incarcerated at the time. *Id.* at 253-55, 260-61. Yslas, however, denied any memory of being assaulted in a bar in February of 2008, or making any accusations against Franklin on the following day during a conversation with Walid. *Id.* at 253-55. Turning to the second alleged incident, Franklin's attorney then questioned Yslas regarding a police report from May 5, 2008, which stated that Yslas had accused Sonny Gardea of assaulting her and then "started to back off [her] story" during her interview with the police. *Id.* at 255-57. Once again, Yslas denied any memory of this incident or making the police report. *Id.*

After this questioning was concluded, Franklin's attorney made an argument to the trial court that these allegedly false accusations of assault were "relevant" to Yslas's character and

8

credibility.  *Id.* at 257.  Accordingly, Franklin's attorney proposed calling two witnesses to the stand.  These would have been the neighbor, Walid, and the police officer who had interviewed Yslas about Sonny Gardea, each of whom would have testified regarding the credibility of Yslas's previous accusations on these two occasions.  *Id.* at 258-61.  As Franklin's attorney explained to the trial court, "[w]e already have an officer to come and testify that [Yslas] was not credible on this May 4th day.  And we have another witness who is prepared to come and testify that Ms. Yslas . . . on February 22nd, claimed that Reginald Franklin beat her up."  *Id.* at 257.

In response, the State's attorney argued that any extrinsic evidence as to a specific instance of a witness's conduct is inadmissible under the Texas Rules of Evidence for the purpose of proving the witness's character for untruthfulness.  *Id.* at 258-61.  The trial court then ruled in favor of the State, reasoning that Franklin's attorney could not "get around the Rule" to introduce these two witnesses.  *Id.* at 261.

It appears that both parties understood the trial court's ruling not only to bar the introduction of additional witnesses regarding these specific instances of Yslas's previous conduct, but also to bar any cross-examination by Franklin's attorney regarding these specific instances.  *See id.*  Franklin's attorney did not introduce Walid or the police officer as witnesses, and never cross-examined Yslas in the presence of the jury regarding the allegedly false accusations that she had made in the past.  *See id.*  The following day, these issues were discussed again at a bench conference.  One of the prosecutors stated on the record that, "the Court's ruling was, I believe, that [Franklin's attorney] would not be allowed to cross-examine" Yslas regarding the previous accusation made to Walid.  *Id.* Vol. 4, at 160.  Franklin's attorney agreed:

The question was whether or not I would be allowed to cross-

9

> examine [Yslas] on those factors, and the Court denied me my
> right to cross-examine.  That is where our appellate issue lies, that
> we were not allowed to go into issues that would have called into
> question further her credibility.  Whether or not Mr. Walid would
> have actually testified, irrelevant.  The question was whether or not
> we were allowed to go into those matters with the complaining
> witness, and we were denied.

*Id.* at 162.

During this conference, the trial court stated, "I don't remember that I made a ruling that you

could not cross-examine her on these issues."  *Id.* at 163.  Franklin's attorney maintained,

however, that he had not been allowed "to cross-examine [Yslas] on allegations that she lied

about that the defendant had beat her up on a date when the defendant was technically incapable

of doing so."  *Id.* at 163-64.

### 4.    Testimony by Mary Aleman

The State's fifth witness was the manager of Reskey's apartment complex, Mary Aleman,

who testified that she had called the police on November 6, 2007, after encountering Yslas in a

state of emotional distress near Reskey's apartment.  *Id.* Vol. 3, at 275-98.  Mary Aleman also

testified that the red marks on Yslas's neck "looked like bruises a hand would make," and added

that she was "sure" that they were not hickeys.  *Id.* at 291.

### 5.    Testimony by Dr. Alvaro Samaniego

Finally, the State's attorneys called Dr. Alvaro Samaniego, a psychiatrist who had treated

Yslas at various times during the previous years, to testify regarding Yslas's mental health.  *Id.*

Vol. 4, at 6-85.  In particular, Dr. Samaniego was called to rebut the impression that Yslas was

"a mental patient and she can't be trusted."  *Id.* Vol. 3, at 272.  Franklin's attorney, however,

opposed permitting Dr. Samaniego to testify about Yslas's mental health.  In particular,

Franklin's attorney was concerned that Dr. Samaniego would portray Yslas as "the classic victim

and that she's abused," which would "make [Franklin] out to be the predator before this jury." *Id.* at 314.  Franklin's attorney argued that "the probative value of that is so greatly outweighed by the prejudicial," such that this testimony had to be excluded.  *Id.*; *id.* Vol. 4, at 28-29, 52. After a hearing during which the trial court considered Dr. Samaniego's testimony outside the presence of the jury, the trial court ruled that Dr. Samaniego could not "talk about what [Yslas] told him about her relationship with [Franklin]."  *Id.* Vol. 4, at 38.  Under the trial court's ruling, rather, Dr. Samaniego would be narrowly permitted to testify that persons with the disorders affecting Yslas would not "typically make up false stories" as a result of these medical conditions.  *Id.* at 39.

Subsequently, when the jury was brought into the courtroom, Dr. Samaniego testified that he had counseled Yslas from August 2005 until March 2006.  *Id.* at 63.  He then testified that he had diagnosed Yslas as "suffering from double depression" and "dependent personality disorder with masochistic tendencies."  *Id.* at 65-67.  He also testified that she grew up in an "abusive family atmosphere," and was subjected to "constant abuse" by her family members.  *Id.* at 67-68. He then testified that persons suffering such disorders had the ability to lie, but that such tendencies are "not a characteristic" of these disorders.  *Id.* at 73.

As a final matter during his direct testimony, Dr. Samaniego also testified regarding the effects of schizophrenia and obsessive-compulsive disorder.  *Id.* at 75-77.  As the testimony by this point had revealed, these mental conditions both affected Reskey, rather than Yslas.  *See id.* Vol. 3, at 87-88, 132-33.  While there is no indication that Dr. Samaniego had ever met or examined Reskey, the State's attorney explained that Dr. Samaniego's testimony would nonetheless be relevant to "shed some light on whether or not in general these afflictions" affecting Reskey would cause him "to be inherently untrustworthy."  *Id.* at 300.  According to

11

Dr. Samaniego, a person with schizophrenia and obsessive-compulsive disorder might suffer from "false beliefs," but "someone who has been compliant . . . for 48 years and taking their medication for schizophrenia" would be able to maintain "a very high level of functioning." *Id.* Vol. 4, at 75-77.

On cross-examination, Dr. Samaniego acknowledged that any person with any mental illness could potentially lie or "be manipulative." *Id.* at 81. He also testified that a person with dependent personality disorder and masochist tendencies might seek "sexual excitement consciously or unconsciously" through "suffering and torture." *Id.* at 82-84. Finally, while pointing out that such occurrences are "not very common, at least in [his] practice," Dr. Samaniego testified that some masochists do seek out "semi-strangulation" because "the lack of oxygen causes or excites a sexual orgasm" due to the reduction of "the blood and the breath." *Id.*

### 6.    Testimony by Michael Gus McGee

The State then rested its case. *Id.* at 85. Franklin's attorneys then called a single witness, Michael Gus McGee, a mental health caseworker who testified regarding his scheduled meeting with Yslas at a homeless shelter on the morning of November 6, 2007, and his recollection of her physical appearance on that day. *Id.* at 89-103.

McGee testified that in his job he ensures that his homeless clients "have access to services for psychiatry-related services, like medication—psychotropic medication." *Id.* at 89-90. He also testified that Yslas was his "client prior to mid-December of 2007." Franklin's attorney did not, however, ask any detailed questions about Yslas's mental health. Rather, he confined his questioning of McGee to what Yslas was wearing on the morning of November 6, 2007, during their scheduled appointment, and whether McGee recalled seeing any "bruisings or redness around her neck." *Id.* at 91. McGee stated that he did not recall what Yslas was wearing

and that he had not seen any marks on Yslas's neck on that day.  *Id.*  Franklin's attorney then passed the witness.  *Id.*

On cross-examination, the State's attorney asked McGee about Yslas's demeanor on that day, and McGee testified that "[s]he was withdrawn.  She – she was unfocused.  She was frantic. She was shivering."  *Id.* at 93.  The State's attorney then asked whether McGee thought "that something had happened to her," to which Franklin's attorney objected as being outside the scope of direct examination.  *Id.* at 93-94.  As Franklin's attorney explained, "I was very specific limiting my questioning as to her appearance, and he wants to go into this other stuff."  *Id.* at 94. Finally, McGee testified that when he had tried to "pry information" from Yslas, she "mentioned her sister and her boyfriend."  *Id.* at 100.  Franklin's attorney then objected to this statement as "nonresponsive," which the trial court sustained and instructed the jury to disregard.  *Id.* at 102. McGee was then excused.  *Id.* at 103.

### 7.     Verdict and sentencing

Franklin's attorneys then rested their case.  *Id.*  The State offered no rebuttal.  *Id.*  At this time, the trial court conducted a conference on jury instructions and charged the jury, after which both the State and Franklin's attorneys presented closing arguments.  *Id.* at 104-60.  The jury returned a verdict of guilty on August 13, 2008.  *Id.* at 168-71.  Because Franklin had elected to permit the trial court to decide his sentence, the jury was dismissed.  *Id.* at 171.

The sentencing phase of Franklin's case began on the same day and lasted until the following morning on August 14, 2008.  *Id.* at 172, 208; *id.* Vol. 5, at 1.  The State called six witnesses.  First, Officer Alberto Aguirre testified about Franklin's previous arrest for assaulting Yslas on November 2, 2007, three days prior to the assault for which Franklin had been convicted during the merits phase of this case.  *Id.* Vol. 4, at 174-77.  Second, Officer Duane

Johnson testified regarding Franklin's arrest for assaulting Yslas on February 13, 2006. *Id.* at 188-97. Third, Officer David Ramirez testified regarding Franklin's separate arrest for assaulting Yslas on February 3, 2006. *Id.* at 200-08. Fourth, Officer Jose Enriquez testified regarding Franklin's arrest for assaulting Yslas on January 5, 2006. *Id.* Vol. 5, at 7-12.

Fifth, the State again called Yslas herself, who testified in general about the history of her relationship with Franklin and the violent incidents that had occurred during that relationship. *Id.* at 17-82. At this point, Yslas was cross-examined regarding her reasons for testifying against Franklin. When questioned by Franklin's attorney, Yslas testified that the State's attorneys had "play[ed] the tapes of the defendant talking to Denise Johnson when he was calling her from the jail" because the State's attorneys "wanted to make sure that [Yslas] knew [Franklin] had another girlfriend." *Id.* at 74-75. Yslas also confirmed that Franklin had said "a lot of bad things" about Yslas during the taped phone conversations. *Id.* at 75. Yslas acknowledged that listening to these taped conversations had made her "mad" and "furious" at Franklin. *Id.* at 74. She also explained that she "want[ed] to save Denise's life" by preventing Franklin from doing "the same things he's done to me to Denise." *Id.* Yslas had made no mention during the merits phase, however, of Denise Johnson or any alleged girlfriend of Franklin's. During the merits phase, neither the State's attorney nor Franklin's attorney had asked Yslas any questions about the tapes of Franklin's phone calls from jail.

Finally, the State called a fingerprint expert, Dale Fernandez, to testify that Franklin's fingerprints matched those contained in certain criminal records resulting from Franklin's prior convictions in Arkansas and Colorado. *Id.* at 83-89. Franklin's attorney did not call any witnesses to present mitigating testimony. *See id.* at 94.

The State's attorney and Franklin's attorney both presented closing statements. *Id.* at 94-

14

124.  The trial court then sentenced Franklin to a term of forty years of imprisonment, certified

his right to an appeal, and adjourned the proceedings.  *Id.* at 124-26.

> **B.       Appeal and Subsequent Proceedings**

The Eighth Court of Appeals for the State of Texas affirmed Franklin's conviction on

July 28, 2010.  *Franklin v. State*, No. 08-08-00274-CR (Tex. App. July 28, 2010).  As set forth in

that opinion, Franklin raised three issues on appeal.  *Id.* at 3.  First, Franklin challenged the trial

court's ruling admitting State's Exhibit 10, the "copy of the letter Ms. Yslas wrote following the

assault on November 5, 2007," which in Franklin's view "constituted inadmissible hearsay" and

contained prejudicial "extraneous offense evidence."  *Id.*  Second, Franklin challenged "the trial

court's decision to allow Mr. Reskey to testify that [Franklin] forced Ms. Yslas to write the

letter," because this testimony also contained hearsay and prejudicial evidence of an extraneous

offense.  *Id.* at 3-4.  The Eighth Court of Appeals denied appeal on these grounds, however,

based on the hearsay exception for admissions by party-opponents and its finding that Franklin's

attorney had made no "timely objection" regarding a prejudicial extraneous offense during

Franklin's trial.  *Id.* at 4-5.

Third, Franklin raised an objection under the Confrontation Clause of the Sixth

Amendment of the United States Constitution.  *Id.* at 5.  In Franklin's view, the trial court had

committed error by preventing Franklin from introducing "evidence that Ms. Yslas had a history

of making false allegations against Appellant."  *Id.*  The Eight Court of Appeals denied appeal on

this ground, however, based on its conclusion that Franklin's attorney "did not raise the Sixth

Amendment Confrontation Clause as a basis for admissibility during the hearing."  *Id.*

Accordingly, under the Texas Rules of Appellate Procedure, this argument was not preserved for

appellate review.  *Id.*

Franklin then filed a petition for discretionary review with the Texas Court of Criminal Appeals ("TCCA"), which was refused in 2010. *See In Re Franklin*, PDR No. 1082-10 (Tex. Crim. App. Dec. 8, 2010). On July 26, 2011, Franklin filed an application for a state writ of habeas corpus based on a series of alleged constitutional violations, which the TCCA denied without a written opinion on September 7, 2011. *See* Resp. 5, ECF No. 11. Franklin then filed a Petition for Writ of Habeas Corpus with this Court on October 13, 2011, in which Franklin raised the same grounds of constitutional error that Franklin had raised in his previous application for a state writ of habeas corpus. *See* Pet. 1-10.

The State responded on January 12, 2012. Resp. 1. The State concedes that "Franklin has exhausted his state court remedies" with respect to all claims raised in his federal habeas petition. *Id.* at 7.

## II.    DISCUSSION

### A.    Standard

The federal courts' role in reviewing state prisoner habeas corpus petitions is narrow. "Indeed, federal courts do not sit as courts of appeal and error for state court convictions." *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986). They must generally defer to state court decisions both on procedural grounds and on the merits. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002); *Muniz v. Johnson*, 132 F.3d 214, 220 (5th Cir. 1998).

According to 28 U.S.C. § 2254(d), a federal court should deny a claim decided by a state court on the merits unless the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or (2) resulted in a decision that was based on an unreasonable

16

determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d) (2012). Thus, relief is authorized if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

Further, relief is available if the state court identifies the correct legal principle under clearly established federal law, but unreasonably applies that principle to the facts of the prisoner's case or reaches a decision based on an unreasonable factual determination. 28 U.S.C. § 2254(d)(1)-(2); *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000). Accordingly, a federal court may not grant relief to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also present. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996). Finally, state court determinations of underlying factual issues are presumed correct, and a petitioner has the burden to rebut the presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Mere disagreement with a state court is not enough, and the standard is one of objective reasonableness. *Montoya*, 226 F.3d at 404.

Where a habeas petition is filed by a pro se litigant, this pleading "must be held to less stringent standards than formal pleadings drafted by lawyers." *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002); *see also* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). However, pro se litigants are still required to provide sufficient facts in support of their claims, and mere conclusory allegations are insufficient. *United States v. Pineda*, 988 F.2d 22, 23 (5th Cir. 1993). "[E]ven pro se litigants must brief arguments to preserve them." *Johnson v. Quarterman*, 479 F.3d 358, 359 (5th Cir. 2007).

### B.      Analysis

Franklin's Petition identifies a series of constitutional violations that, in Franklin's view, were committed during the course of Franklin's trial.  In particular, Franklin argues (1) that he was improperly denied the right to cross-examine Yslas and introduce extrinsic evidence regarding false accusations that Yslas had made previously, as well as cross-examine Yslas regarding her mental health, (2) that the State knowingly relied on Yslas's perjured testimony to obtain Franklin's conviction, (3) that the State lost or destroyed exculpatory photographs of Yslas's injuries, (4) that the State concealed evidence and failed to make required disclosures that could have been used to impeach Yslas during trial, (5) that the conviction was obtained by the State's prosecutorial misconduct, (6) that two letters entered into evidence were obtained through an unconstitutional search and seizure, (7) that Franklin received ineffective assistance of counsel both at trial and at sentencing based on numerous omissions by his attorneys, and (8) that Franklin is actually innocent of the charged offense.

### 1.      Rulings by the trial court during cross-examination of Yslas

Franklin argues in his Petition that the trial court violated the Sixth Amendment "when it denied [Franklin] the right to fully cross-examine [Yslas] or to put on witnesses to show that [Yslas] had lied in the past about being assaulted."  Pet. 18.  Franklin further argues that he "was prevented from questioning complainant and her psychiatrist, Michael McGee, regarding her most current [mental health] interview, [mental health] records, and mental condition during the period of the alleged assault."  Pet. 19.  According to Franklin, the trial court's rulings on these questions were contrary to the Supreme Court's interpretation of the Sixth Amendment in *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), and the Supreme Court's holding regarding the right of a defendant in a criminal case to have compulsory process for obtaining witnesses in his

favor in *Washington v. Texas*, 388 U.S. 14 (1967).  Pet. 18-20.  To the extent that the trial court

based its decision on the Texas Rules of Evidence, Franklin argues that "when state rules of

evidence conflict with the U.S. Constitution . . . the Constitution of the United States controls

over the evidentiary rules."  Reply 17, ECF No. 12.

      Franklin's Petition cannot, however, be granted on these grounds.  "A federal court may

grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling violates

a specific federal constitutional right or is so egregious that it renders the petitioner's trial

fundamentally unfair."  *Kittelson v. Dretke*, 426 F.3d 306, 320 (5th Cir. 2005) (quoting *Brown v.

Dretke*, 419 F.3d 365, 376 (5th Cir. 2005)).  Here, as explained below, the trial court's

evidentiary rulings created no such constitutional violation or fundamental unfairness.

### a.       Restrictions on cross-examination as to previous accusations

      The Supreme Court acknowledged in *Van Arsdall* that "denial of a defendant's

opportunity to impeach a witness for bias" violates the Sixth Amendment where it constitutes

harmful error.  *Van Arsdall*, 475 U.S. at 684.  But, as the United States Court of Appeals for the

Fifth Circuit has explained, "bias" and "general character for untruthfulness" are distinct grounds

for impeachment.  *United States v. Skelton*, 514 F.3d 433, 441-42 (5th Cir. 2008) (analyzing

*United States v. Abel*, 469 U.S. 45, 56 (1984)).  Therefore, although trial courts have discretion

to "permit[] the impeachment of the general credibility of a witness, there is no constitutional

right to do so."  *See id.* at 445 (citing *Cloud v. Thomas*, 627 F.2d 742, 743-44 (5th Cir. 1980)).

      Here, Franklin claims his attorney sought to show that Yslas "had lied in the past" or had

"a chronic liar personality," but was denied the right to do so on cross-examination.  *See* Pet. 18.

Because such impeachment would have addressed "general credibility" rather than "bias,"

however, the trial court did not violate Franklin's rights under the Sixth Amendment when it

denied Franklin the right to conduct such cross-examination.  *See Skelton*, 514 F.3d at 445.  This

conclusion is confirmed by several federal district courts in Texas, which have also denied

habeas relief on Sixth Amendment grounds where trial courts have excluded cross-examination

of a criminal complainant regarding previous false accusations.  *See Decluitt v. Dir., TDCJ-CID*,

1:04CV589, 2012 WL 1669834, at *10 (E.D. Tex. Mar. 8, 2012) (denying habeas relief based on

the exclusion of cross-examination regarding "prior bad acts by the complainant, in the form of

false accusations of molestation"), *report and recommendation adopted*, 1:04-CV-589, 2012 WL

1670222 (E.D. Tex. May 11, 2012); *Buck v. Quarterman*, CIVA H-08-272, 2009 WL 281046, at

*6 (S.D. Tex. Feb. 2, 2009) (denying habeas relief based on the exclusion of cross-examination

regarding a witness's "prior assault claims she made against other men").

        Accordingly, the trial court's ruling that Yslas could not be cross-examined regarding her

previous false accusations was within the trial court's discretion and did not violate the Sixth

Amendment.  *See Skelton*, 514 F.3d at 445 (citing *Cloud*, 627 F.2d at 743-44); *Buck*, 2009 WL

281046, at *6.  This Court therefore cannot grant Franklin habeas relief on this basis.

### b.      Restrictions on extrinsic testimony

        The trial court also did not violate the Sixth Amendment when it excluded extrinsic

testimony from Walid or the police officer regarding Yslas's previous accusations for the

purpose of demonstrating Yslas's propensity for lying.  *See* Tr. Vol. 3, at 261.  The "right to

cross-examination . . . is subject to the wide latitude of trial judges to impose reasonable limits."

*Bigby v. Dretke*, 402 F.3d 551, 573 (5th Cir. 2005).  The Sixth Amendment therefore creates no

right to introduce extrinsic evidence of "specific instances of a witness' conduct to prove the

witness' character for untruthfulness."  *Nevada v. Jackson*, --- U.S. ---, 133 S. Ct. 1990, 1992-93

(2013).

20

Accordingly, a "widely accepted rule of evidence law" precludes the introduction of such extrinsic evidence, other than previous criminal convictions, for the purpose of impeachment. *Id.*; *see also* Christopher B. Mueller & Laird C. Kirkpatrick, 3 Federal Evidence § 6:36 (3d ed.) ("This principle serves several useful purposes.  It helps keep the focus of the trial on substance and matters bearing immediately on credibility.").  This rule of evidence is reflected not only in the Texas Rules of Evidence, but also in the Federal Rules of Evidence.  *See* Fed. R. Evid. 608(b) ("Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness.").

The Supreme Court recently upheld a Nevada statute that, much like the Texas Rules of Evidence, precludes such evidence.  *See Jackson*, 133 S. Ct. at 1992-93.  As the Supreme Court explained, "[t]he constitutional propriety of this rule cannot be seriously disputed."  *Id*.  In Franklin's case, therefore, the trial court's application of this constitutionally acceptable rule of evidence law to exclude testimony from Walid or the police officer regarding Yslas's previous accusations also did not violate the Sixth Amendment.  *See id.*

This evidentiary ruling, moreover, did not violate Franklin's right to compulsory process under the Sixth Amendment, as Franklin has argued in the alternative.  *See* Pet. 18-20.  The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor."  *Janecka v. Cockrell*, 301 F.3d 316, 326 (5th Cir. 2002).  The Supreme Court has made clear, however, that in order to establish a violation of the right to compulsory process, a petitioner must show more than the mere absence of a defense witness's testimony at trial.  *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982).  Rather, a petitioner "must at least make some plausible showing of how

21

[the absent witness's] testimony would have been both material and favorable to his defense." *Id.*  Such testimony must also constitute "otherwise admissible evidence." *United States v. Lewis*, 313 F. App'x 703, 707 n.2 (5th Cir. 2009) (quoting *United States v. Davis*, 639 F.2d 239, 243 (5th Cir. 1981)); *United States v. Wade*, 356 F. App'x 704, 708 n.2 (5th Cir. 2009).  Since the extrinsic testimony of Walid and the police officer was not admissible for the purpose of showing Yslas's character for untruthfulness, such testimony therefore was not subject to compulsory process.  *See Lewis*, 313 F. App'x at 707 n.2; *Davis*, 639 F.2d at 243.

### c.     Restrictions on cross-examination regarding mental health

Finally, Franklin is not entitled to habeas relief on the basis that he "was prevented from questioning [Yslas] and her psychiatrist, Michael McGee, regarding her most current [mental health] interview, [mental health] records, and mental condition during the period of the alleged assault." *See* Pet. 19.  It is true that "a defendant has 'the right to attempt to challenge [a witness's] credibility with competent or relevant evidence of any mental defect or treatment at a time probatively related to the time period about which [that witness] was attempting to testify.'" *United States v. Jimenez*, 256 F.3d 330, 343 (5th Cir. 2001) (quoting *United States v. Partin*, 493 F.2d 750, 763 (5th Cir. 1974)).  This right is a component of the right to confront witnesses under the Sixth Amendment.  *See Jimenez*, 256 F.3d at 343-45; *Greene v. Wainwright*, 634 F.2d 272, 274-76 (5th Cir. 1981).  "This right, however, is not limitless." *Wade*, 356 F. App'x at 709. To be admissible, "the mental health records must evince an 'impairment' of the witness's 'ability to comprehend, know, and correctly relate the truth.'" *Jimenez*, 256 F.3d at 343-44 (quoting *Partin*, 493 F.2d at 762); *Wade*, 356 F. App'x at 709.

Accordingly, while a "diagnosis of schizophrenia or a psychosis will be relevant" to a witness's credibility in most cases, trial courts are "permitted greater latitude in excluding

22

records and limiting cross-examination" as to "witnesses whose mental history is less severe."
*Jimenez*, 256 F.3d at 343-44.  In particular, after surveying cases from a variety of federal courts
of appeals, the Fifth Circuit found in *Jimenez* that depression, suicide attempts, and reliance on
medications such as Prozac and Elavil were "less severe" than "a diagnosis of schizophrenia or a
psychosis," and therefore more susceptible to reasonable limitations on impeachment testimony.
*See id.* (collecting cases).  In *Wade*, similarly, the Fifth Circuit upheld the district court's
decision to exclude expert testimony regarding a witness's "severe major depression and severe
generalized anxiety" because it lacked probative value and was likely to "confuse the jury."  *See
Wade*, 356 F. App'x at 707, 710 (internal quotation marks omitted).

In Franklin's case, the evidence at trial showed that Yslas suffered from depression,
alcoholism, and masochistic tendencies.  *See* Tr. Vol. 3, at 174-75; *id.* Vol. 4, at 65-68.  The
testimony at trial indicated that the tendency to lie or make up false stories is "not a
characteristic" of these disorders.  *Id.* Vol. 4, at 73.  There was, therefore, no indication from the
testimony at trial that any of these mental health conditions caused "'impairment' of the
witness's 'ability to comprehend, know, and correctly relate the truth.'"  *See Jimenez*, 256 F.3d
at 343-44 (quoting *Partin*, 493 F.2d at 762); *Wade*, 356 F. App'x at 709.  Accordingly, under
settled law in the Fifth Circuit, the trial court had "greater latitude in excluding records and
limiting cross-examination" regarding Yslas's mental health than would be appropriate for a
witness suffering from psychosis or schizophrenia.  *See Jimenez*, 256 F.3d at 343-44; *Wade*, 356
F. App'x at 707, 710.

The only restriction placed by the trial court on cross-examination regarding mental
health was that Franklin's attorney could not ask Yslas about "what they discussed" during her
sessions with McGee, because "to go into their meeting and their conversations" was a violation

of "a definite patient right." *See* Tr. Vol. 3, at 247-48. Neither the record nor Franklin's Petition indicate, however, what additional testimony about these meetings and conversations would have revealed regarding Yslas's ability to understand the truth. *See* Pet. 18-19. For example, there is no indication that Yslas's recent conversations with McGee uncovered a new or different mental health condition that might have had a greater effect on her ability to understand the truth. *See id.* Neither the record nor Franklin's Petition, therefore, provide any basis to conclude that further information about these conversations would have further enabled Franklin to impeach Yslas's credibility. *See Jimenez*, 256 F.3d at 343-44; *Wade*, 356 F. App'x at 707, 710.

Moreover, despite this single restriction, the trial court permitted substantial questioning of Yslas, Samaniego, and McGee regarding Yslas's mental health. Franklin's attorney questioned Yslas regarding her previous statement that she had accused Franklin of assault because she was a "psychiatric patient" who would "drink and use drugs." Tr. Vol. 3, at 239. He also cross-examined Dr. Samaniego on the question of whether a person with any mental illness could potentially lie or "be manipulative," and whether a patient with Yslas's mental disorders might experience "sexual excitement consciously or unconsciously" through "suffering and torture." *Id.* Vol. 4, at 82-84. As for the testimony offered by McGee, who was a witness for the defense, Franklin's attorney was "very specific limiting [his] questioning as to [Yslas's] appearance." *Id.* at 91-94. This was apparently done intentionally, so as to prevent the State's attorney from cross-examining McGee as to "other stuff" involving Yslas's history of abuse. *See Id.* at 94.

Therefore, given the extensive discussion of Yslas's mental health during Franklin's trial and the lack of any evidence that Yslas "suffered from an impairment affecting [her] ability to comprehend and tell the truth," the trial court's minimal restriction on testimony regarding

24

McGee's interviews with Yslas did not violate Franklin's right to confront Yslas under the Sixth Amendment.  *See Jimenez*, 256 F.3d at 344-45; *Wade*, 356 F. App'x at 707, 710.

### 2.     Knowing use of perjured testimony

Franklin further argues in his Petition that the State violated his right to due process under the Fourteenth Amendment by "knowingly using perjured testimony" to obtain Franklin's conviction.  Pet. 22.  In Franklin's view, his conviction violated the holding of *Napue v. Illinois*, 360 U.S. 26 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972), because "it was procured through the use of perjured testimony by complainant, Maria Yslas, and it had a major impact on the verdict."  *Id.* at 22-24.

Franklin's Petition cannot, however, be granted on these grounds.  Franklin is correct that the Supreme Court held in *Giglio* that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice,'" as is the failure to correct known perjury even where the State is not actively "soliciting false evidence."  *Giglio*, 405 U.S. at 153 (citations omitted).  But to establish that his right to due process of law has been violated, a petitioner must show (1) the actual falsity of a witness's testimony, (2) that the prosecution knew the witness's testimony was false, and (3) that the testimony was material.  *Beltran v. Cockrell*, 294 F.3d 730 (5th Cir. 2002); *Kutzner v. Cockrell*, 242 F.3d 605, 609 (5th Cir. 2001); *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996).

Franklin's arguments regarding perjury fail to satisfy the first and second components of this test.  The record does not show Yslas's testimony was false, nor that the prosecution knew it was so.  *See Beltran*, 294 F.3d at 730; *Kutzner*, 242 F.3d at 609.

The only indication that Yslas's testimony may have been false is that "[o]n January 30, 2008, the complainant, Maria Yslas, signed an affidavit under oath, admitting that the applicant

never choked or assaulted her and that she had accused applicant Franklin due to her intoxication and mental condition," which contradicted her testimony at trial. *See* Pet. 22. In the Fifth Circuit, however, contradictory testimony among witnesses or inconsistencies within a witness's testimony are to be resolved by the trier of fact and do not suffice to establish that certain testimony was perjury. *Kutzner*, 242 F.3d at 609 ("Conflicting or inconsistent testimony is insufficient to establish perjury."); *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990); *Little v. Butler*, 848 F.2d 73, 76 (5th Cir. 1988). District courts in the Fifth Circuit have therefore frequently denied habeas petitions alleging perjury based only on showings of contradictory testimony. *Lee v. Dir.*, TDCJ-CID, 6:12CV287, 2012 WL 4891696, at *11 (E.D. Tex. Sept. 17, 2012), *report and recommendation adopted*, 6:12CV287, 2012 WL 4894687 (E.D. Tex. Oct. 15, 2012); *Williams v. Thaler*, 2011 WL 1044114, at *8-9 (W.D. Tex. 2011); *Pugh v. Thaler*, 2011 WL 2181794, at *12 (W.D. Tex. 2011). The contradictions between Yslas's Non-Prosecution Affidavit and Yslas's trial testimony, therefore, cannot prove that Yslas's trial testimony was false. *See Koch*, 907 F.2d at 531.

Further, even assuming that the version of events offered by Yslas at trial was false, the record does not indicate that its falsity was known to the State. Without "a showing that . . . the prosecution team knew of the testimony's falsity," an allegation that the State knowingly used perjury cannot support habeas relief. *Kutzner*, 242 F.3d ats 609; *Koch*, 907 F.2d at 531; *Pugh*, 2011 WL 2181794, at *12. Here, the only evidence that the State was aware of alleged perjury is that the State was also aware of the contradictions between Yslas's trial testimony and her Non-Prosecution Affidavit. *See* Pet. 22-23. But this does not demonstrate that the version of events offered by Yslas at trial was false, nor does it show that the version of events in the Non-Prosecution Affidavit was true. It also does not prove that the State had any reason to believe the

Non-Prosecution Affidavit over Yslas's trial testimony.  On the contrary, all of the testimony offered at trial regarding the marks on Yslas's neck, including the testimony of Aleman, Officer Clifford, and Officer Vega, corroborated Yslas's testimony that the marks on her neck were not hickeys, but impressions left by fingers.  *See* Tr. Vol. 3, at 35-36, 77, 291.

Accordingly, the record in this case neither shows that the testimony at trial was false, nor that the prosecution team knew of the testimony's falsity.  Franklin therefore is not entitled to habeas relief on the basis of the State's use of perjury or false evidence.  *Kutzner*, 242 F.3d at 609; *Koch*, 907 F.2d at 531; *Pugh*, 2011 WL 2181794, at *12.

### 3.    Loss or destruction of the photographic evidence

Franklin further argues in his Petition that the State violated the Fourteenth Amendment and the Fifth Amendment by failing to preserve "evidence that might be expected to play a significant role in the suspect's defense."  *See Cal. v. Trombetta*, 467 U.S. 479, 488 (1984).  In particular, Franklin argues that the State was obligated to preserve the digital photographs taken by the police of the marks on Yslas's neck on November 6, 2007.  Pet. 25.  Franklin is not entitled to habeas relief on this basis, however, because the record does not reveal either (1) that the photographs were both "material and exculpatory" or, (2) if the photographs were merely "potentially useful," that the State has acted in bad faith.  *See Bower v. Quarterman*, 497 F.3d 459, 476-77 (5th Cir. 2007) (analyzing *Brady v. Md.*, 373 U.S. 83 (1963) and *Ariz. v. Youngblood*, 488 U.S. 51 (1988)).

Pursuant to *Brady v. Maryland*, due process is violated when the prosecution suppresses or fails to disclose material exculpatory evidence to the defense.  *Ill. v. Fisher*, 540 U.S. 544, 547 (2004) (analyzing *Brady* and *United States v. Agurs*, 427 U.S. 97 (1976)); *Bower*, 497 F.3d at 476-77.  A *Brady* violation may occur regardless of whether the State acted in good or bad faith.

27

*Fisher*, 540 U.S. at 547.  To give rise to a *Brady* violation, however, lost or destroyed evidence must possess "an exculpatory value that was apparent before the evidence was destroyed" and be of "such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489; *Bower*, 497 F.3d at 476-77.  Where the exculpatory value of evidence is not apparent prior to its loss or destruction, however, and the evidence is merely "potentially useful," then the State's failure to preserve the evidence is addressed according to the related but distinct analysis applied in *Arizona v. Youngblood*, 488 U.S. 51 (1988).  Under *Youngblood*, the loss or destruction of "potentially useful" evidence constitutes a denial of due process only where the record reveals that the government acted in "bad faith." *Youngblood*, 488 U.S. at 57-58; *Fisher*, 540 U.S. at 547; *Bower*, 497 F.3d at 476-77.

Here, the record in this case does not indicate that the lost photographs were exculpatory or material. *See Banks v. Thaler*, 583 F.3d 295, 310 (5th Cir. 2009); *Bower*, 497 F.3d at 476-77. No testimony by affidavit or by any trial witness has indicated that the photographs would show the marks on Yslas's neck on November 6, 2007, to resemble hickeys rather than marks made by Franklin's fingers. *See* Tr. Vol. 3, at 35-36, 77, 291.  On the contrary, the testimony of Aleman, Officer Clifford, and Officer Vega corroborated Yslas's trial testimony that the marks had been left by fingers. *See id*.  Reskey also testified that on November 5, 2007, he was present during the physical struggle between Franklin and Yslas, that he saw Yslas's "feet were convulsing," and that he heard Yslas "gasp[ing] for air," which also corroborates Yslas's testimony that she was strangled. *See id*. at 115-17.  Franklin's argument that the photographs necessarily were exculpatory, rather than incriminating, is therefore speculative.  "A claim that is largely speculative with respect to the effect of the allegedly exculpatory evidence on the jury's ultimate determination of guilt or innocence cannot support a *Brady* violation." *United States v.*

28

*Edwards*, 442 F.3d 258, 268 (5th Cir. 2006) (quoting *Pippin v. Dretke*, 434 F.3d 782, 789 n.7 (5th Cir. 2005)).

At trial, moreover, Franklin was not "without alternative means of demonstrating [his] innocence" with particular regard to the appearance of Yslas's neck on November 6, 2007. *See Trombetta*, 467 U.S. at 490; *Bower*, 497 F.3d at 476-77. In *California v. Trombetta*, the United States Supreme Court observed that no constitutional violation had occurred where the State had failed to preserve "breath samples" taken from motorists suspected of driving while intoxicated. *Trombetta*, 467 U.S. at 489-90. As the Supreme Court reasoned, "the right to cross-examine the law enforcement officer who administered the Intoxilyzer test" was an adequate alternative means for defendants to challenge "whether the test was properly administered" and thereby protect against "operator error" in the assessment of the defendants' intoxication. *Id.*

A similar solution was also available in Franklin's case, because Officer Vega was available for cross-examination regarding her failure to preserve the digital photographs. *See* Tr. Vol. 3, at 38-43. In fact, Franklin's attorney actually did cross-examine Officer Vega on this very issue. *See id.* at 50-51. Additionally, Franklin was able to cross-examine two other witnesses for the prosecution, Aleman and Officer Clifford, regarding the appearance of Yslas's neck on November 6, 2007, and their recollections that the marks were not hickeys. *See id.* at 77, 291. Finally, Franklin was also able to call at least one of his own witnesses, McGee, who saw Yslas on the same day that the photographs had been taken, to testify as to whether there were "bruisings or redness around [Yslas's] neck." *See* Tr. Vol. 4, at 91. The availability of such witness testimony at Franklin's trial on both direct and cross-examination demonstrates that the defense was adequately able to "obtain comparable evidence by other reasonably available means," even after the digital photos had been deleted. *See Trombetta*, 467 U.S. at 489; *Bower*,

497 F.3d at 476-77.

Therefore, because Franklin has not demonstrated that the lost evidence possessed "an exculpatory value that was apparent before the evidence was destroyed" and because Franklin could—and did, by calling McGee as a witness and cross-examining the State's witnesses—obtain "comparable evidence by other reasonably available means," the failure of the police to preserve the digital photographs did not violate the rule set forth in *Brady*. *See Trombetta*, 467 U.S. at 489; *Bower*, 497 F.3d at 476-77.   Franklin cannot be granted habeas relief on this basis.

Nor is Franklin entitled to habeas relief based on the *Youngblood* rule, assuming that the deleted photographs were "potentially useful" evidence that could possibly have aided his defense. *See Youngblood*, 488 U.S. at 57-58.   Under *Youngblood*, the loss or destruction of "potentially useful" evidence constitutes a denial of due process only where the record reveals that the government acted in "bad faith." *Youngblood*, 488 U.S. at 57-58; *Fisher*, 540 U.S. at 547; *Bower*, 497 F.3d at 476-77.   Here, however, the record itself does not demonstrate bad faith, and Franklin has not adduced any new evidence regarding the circumstances of the photographs' deletion or the manner in which the police conducted the investigation.   Officer Vega offered the only testimony at trial regarding the deletion of the photographs. *See* Tr. Vol. 3, at 38-43. According to Officer Vega, the digital images were transferred from the digital camera to a computer at the regional command center, but then were lost after being routinely deleted from the camera's memory card. *Id.* at 43.   Officer Vega admitted that she lacked "any explanation for what happened" to the images. *See id.* at 44.   While this statement demonstrates a troubling carelessness on the part of the police in the handling of evidence, this statement does not by itself support a finding of bad faith.   In his Petition, Franklin also has not pointed to any additional evidence that the photographs were lost as the result of bad faith. *See* Pet. 26.   Franklin therefore

30

is not entitled to habeas relief under the *Youngblood* analysis. *See Fisher*, 540 U.S. at 547; *Bower*, 497 F.3d at 476-77.

Accordingly, because the record in this case does not show that these photographs either were material and apparently exculpatory under *Brady,* or destroyed in bad faith under *Youngblood*, Franklin cannot obtain habeas relief based on the State's failure to preserve the photographs. *See Fisher*, 540 U.S. at 547; *Bower*, 497 F.3d at 476-77.

### 4.    Concealment of favorable impeachment evidence

Additionally, Franklin argues that the State failed to make disclosures that would have been relevant for impeachment purposes. Pet. 28. In particular, Franklin points to two disclosures that could have been used to "expose" Yslas "as a chronic liar." Pet. 28. First, Franklin argues that "interview notes and records" produced during Yslas's sessions with McGee should have been provided to Franklin's attorney for impeachment purposes. *Id.* Second, Franklin argues that the State should have disclosed to Franklin's attorney the fact that "prosecutors allowed the complainant, Yslas, to listen to phone conversations of [Franklin] discussing personal matters with his current girlfriend." *Id.* According to Franklin, the failure to disclose such evidence is a violation of the Supreme Court's holdings in *Bagley* and *Agurs*. *Id.* at 28-29.

As Franklin has correctly argued, "the requirement that the prosecution disclose exculpatory evidence does extend to information that could be used to impeach government witnesses." *Felder v. Johnson*, 180 F.3d 206, 212 (5th Cir. 1999) (analyzing *Bagley*, 473 U.S. at 676, and *Brady*, 373 U.S. at 87); *United States v. Lee*, 88 F. App'x 682, 684 (5th Cir. 2004). However, Franklin's claim regarding impeachment evidence in this case must fail purely for factual reasons. "The burden falls on [the habeas petitioner] to convince this court 'that there is a

reasonable probability that the result of the trial would have been different if the suppressed

[impeachment evidence] had been disclosed to the defense.'" *Summers v. Dretke*, 431 F.3d 861,

881 (5th Cir. 2005) (quoting *Strickler v. Greene*, 527 U.S. 263, 289 (1999)).  Here, the record

shows that the impeachment evidence identified by Franklin was actually made available to

Franklin's attorney before trial, and Franklin has not carried his burden to demonstrate

otherwise.

Although the trial court ruled during a bench conference that Franklin's attorney could

not ask Yslas any questions about "what they discussed" during her sessions with McGee,

because "to go into their meeting and their conversations" was a violation of "a definite patient

right," it was clear that Franklin's attorney was actually familiar with the contents of Yslas's

mental health records and was already aware of what had been discussed during her sessions

with McGee.  *See* Tr. Vol. 3, at 246-48.  For example, Franklin's attorney was aware that Yslas

and McGee had discussed Yslas's problems with her sister.  *See id.*  The accuracy of this

understanding was confirmed by McGee's own testimony later in the trial, suggesting that

Franklin's attorney had indeed reviewed the interview records.  *See id.* Vol. 4, at 100.  To the

extent that Franklin's attorney did not discuss other aspects of Yslas's mental health in detail,

this appears to have been a matter of trial strategy rather than the State's failure to disclose

evidence.  That is, Franklin's attorney voiced concern during a bench conference that extensive

discussion of Yslas's mental health would give the impression that Yslas was "the classic

victim," which would "make [Franklin] out to be the predator before this jury."  *See id.* Vol. 3, at

314.  Franklin's Petition does not point to any evidence that would rebut the impression from the

trial transcript that Franklin's attorney was already familiar with Yslas's mental health records.

Franklin therefore fails to show that the State prevented Franklin's attorney from obtaining

access to these records in any way.  *See* Pet. 28-30.

A similar factual problem arises with respect to Franklin's arguments regarding the State's alleged concealment of the fact that Yslas had listened to taped conversations between Franklin and his new girlfriend.  *See id.*  Franklin is undoubtedly correct that "proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."  *See Skelton*, 514 F.3d at 442 (analyzing *Abel*, 469 U.S. at 52).  But the trial transcript demonstrates that Franklin's attorney was actually well aware of this potential impeachment evidence.  *See* Tr. Vol. 5, at 74-75.

On August 14, 2008, during the sentencing phase of the trial, Franklin's attorney cross-examined Yslas regarding these taped phone conversations.  *Id.*  The first question posed by Franklin's attorney on the topic was as follows: "Let me ask you this: Did the State ever play the tapes of the defendant talking to Denise Johnson when he was calling her from the jail?"  *Id.*  After Yslas answered in the affirmative, Franklin's attorney asked a second question: "Okay. They wanted to make sure that you knew that he had another girlfriend, right?"  *Id.*  Prior to these questions, Denise Johnson had not been mentioned during the trial, but the phrasing of these questions by Franklin's attorney indicates that he had learned of these facts prior to the proceedings and was aware of what Yslas's answer likely would be.  *See id.*  This significantly undermines Franklin's allegation that this information only "became known" to his attorney "during the punishment phase by admission from [Yslas]" on August 14, 2008.  *See* Pet. 28. Although Yslas was not cross-examined about this possible source of bias during the merits phase on August 12 and 13, 2008, the record reveals no reason to believe that this impeachment evidence was suddenly disclosed to Franklin's attorney during the brief adjournment between the

33

two proceedings.  *See* Pet. 28-30.  Franklin has not provided affidavit testimony by Franklin's

attorney or by any other party that would suggest such an unusual sequence of events.

Therefore, the record in this case does not show that the State's attorneys failed to

"disclose exculpatory evidence . . . that could be used to impeach government witnesses" during

his criminal trial.  *See Felder*, 180 F.3d at 212 (analyzing *Bagley*, U.S. at 676, and *Brady*, 373

U.S. at 87); *Lee*, 88 F. App'x at 684.  "The burden falls on [the habeas petitioner] to convince

this court 'that there is a reasonable probability that the result of the trial would have been

different if the suppressed [impeachment evidence] had been disclosed to the defense.'"

*Summers*, 431 F.3d at 881 (quoting *Strickler*, 527 U.S. at 289).  The record in this case shows,

however, that both of the disclosures Franklin identifies were actually made by the State.

Franklin therefore is not entitled to habeas relief on the grounds that favorable impeachment

evidence was concealed from him during trial.  *See id.*

### 5.  Prosecutorial misconduct

Franklin also argues that "the State violated his constitutional rights to a fair trial under

the Fifth Amendment" and his "due process rights under the Fourteenth Amendment" by

committing three acts of prosecutorial misconduct in violation of *Darden v. Wainwright*, 477

U.S. 168, 180 (1986).  Pet. 31.  In particular, Franklin alleges prosecutorial misconduct based on

the State's knowing use of perjured testimony, failure to disclose key impeachment evidence,

and witness tampering with respect to Reskey and Yslas.  *Id.*

Where prosecutorial misconduct has rendered a trial "fundamentally unfair," a petitioner

is entitled to habeas relief.  *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000) (citing *Foy

v. Donnelly*, 959 F.2d 1307, 1317 (5th Cir. 1992)).  "The appropriate standard of review for such

a claim on writ of habeas corpus is the narrow one of due process, and not the broad exercise of

supervisory power." *Id.* (quoting *Darden*, 477 U.S. at 181).  Here, none of the three instances of alleged prosecutorial misconduct rendered Franklin's trial fundamentally unfair or violated his right to due process.

The Court has already addressed Franklin's first two claims of prosecutorial misconduct in its previous analysis, and concluded that neither one constituted a violation of Franklin's constitutional rights.  First, Franklin's identification of inconsistencies between Yslas's testimony and her out-of-court statements is insufficient to demonstrate perjury, because these inconsistencies neither establish the falsity of Yslas's trial testimony nor the prosecution's knowledge of its falsity.  *See Kutzner*, 242 F.3d at 609 ("Conflicting or inconsistent testimony is insufficient to establish perjury."); *Koch*, 907 F.2d at 531.  Second, the trial transcript demonstrated that Franklin's attorney was aware of all the key impeachment evidence identified by Franklin, including both the contents of the mental health records and the fact that Yslas had listened to recorded conversations between Franklin and his new girlfriend.  *See* Tr. Vol. 3, at 246-48; *id.* Vol. 5, at 74-75.  Therefore, the record does not reveal that the State's attorneys failed to "disclose exculpatory evidence . . . that could be used to impeach government witnesses" during his criminal trial.  *See Summers*, 431 F.3d at 881 (quoting *Strickler*, 527 U.S. at 289).  Accordingly, since neither of these first two allegations gave rise to any fundamental unfairness during Franklin's trial, neither of these allegations constituted prosecutorial misconduct that could entitle Franklin to habeas relief.  *See Barrientes*, 221 F.3d at 753 (citing *Foy*, 959 F.2d at 1317).

Similarly, there is no merit to Franklin's third claim of prosecutorial misconduct related to "witness tampering."  *See* Pet. 31.  According to Franklin, the State's attorneys violated his right to due process by showing Reskey and Yslas his criminal records "in order to convince

them that [Franklin] is a dangerous person," and by permitting Yslas to listen to taped phone conversations between Franklin and his new girlfriend.  Pet. 31-32.  However, Franklin points to no legal authority for the proposition that the discussion of Franklin's criminal history or Franklin's new girlfriend with the witnesses constitutes "witness tampering" or any other form of prosecutorial misconduct.  Whether characterized as "witness tampering," which generally requires a showing that a party "substantially interfered" with witnesses' decision to testify by "threats or intimidation," see *United States v. Girod*, 646 F.3d 304, 310-12 (5th Cir. 2011), or as an improper "inducement" given to encourage these two witnesses to testify, see *United States v. Burns*, 526 F.3d 852, 860 (5th Cir. 2008), Franklin cannot show based on these alleged discussions between the witnesses and the State's attorneys that he was denied his right to due process.

It is true that a criminal defendant possesses a constitutional right "to present witnesses to 'establish his defense without fear of retaliation against the witness by the government.'"  *Girod*, 646 F.3d at 310 (quoting *United States v. Dupre*, 117 F.3d 810, 823 (5th Cir. 1997)).  But only "substantial governmental interference with a defense witness' choice to testify may violate the due process rights of the defendant."  *Id.* (quoting *Dupre*, 117 F.3d at 823).  "To make a showing that the government has infringed on this right, the defendant must show that 'the government's conduct interfered substantially with a witness's 'free and unhampered choice' to testify."  *United States v. Thompson*, 130 F.3d 676, 687 (5th Cir. 1997).  In particular, "[p]resenting the potential defense witnesses with the facts of the investigation and the crimes charged does not amount to witness intimidation; there must be evidence of threats or intimidation."  *Girod*, 646 F.3d at 312.  The same test is applied where the government allegedly interferes with its own witnesses' decision to "cooperate with the defense" based on "threats or retribution."  *See id.* at

36

313. Here, however, Franklin has made no allegation that the States' attorneys ever threatened retribution against either of these witnesses if they chose not to testify against Franklin. *See* Pet. 31-32. Nor has Franklin described facts to suggest that the State has substantially interfered with these witnesses' free and unhampered choice to testify. *See* Pet. 31-32. Franklin therefore cannot demonstrate prosecutorial misconduct on this basis. *See Girod*, 646 F.3d at 310-13.

Additionally, Franklin cannot show that these alleged discussions between the witnesses and the State's attorneys constituted "inducements" that would constitute prosecutorial misconduct. It is settled law in the Fifth Circuit that that the government may provide "inducements" to encourage witnesses to testify without "disqualify[ing] the witness or violat[ing] the defendant's due process rights." *Burns*, 526 F.3d at 860 (citing *United States. v. Garcia Abrego*, 141 F.3d 142, 152 (5th Cir. 1998)). For example, "[n]o practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime . . . and having that witness testify under a plea bargain that promises him a reduced sentence." *Garcia Abrego*, 141 F.3d at 152 (quoting *United States v. Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987) (en banc)). Even where a witness "receives financial compensation in exchange for testimony," there is no violation of due process so long as it is left "up to the jury to evaluate the credibility of the compensated witness." *Id.* (quoting *Cervantes-Pacheco*, 826 F.2d at 315).

Therefore, since even such inducements as plea bargains and financial compensation do not violate a defendant's due process rights or give rise to fundamental unfairness, this Court cannot conclude that the far less intrusive conduct identified by Franklin constitutes prosecutorial misconduct. *See Burns*, 526 F.3d at 860. Here, Franklin's attorney demonstrated that he was fully aware of all the sources of arguable bias affecting Yslas and Reskey. He stated during a

37

bench conference that Reskey had been shown Franklin's criminal history, and during cross-examination that Yslas had listened to the taped conversations between Franklin and Denise Johnson.  Tr. Vol. 3, at 154, 158; *id.* Vol. 5, at 74-75.

No act of the prosecutors prevented Franklin's attorney from cross-examining these witnesses on these grounds and leaving the question of their credibility "up to the jury."  *See Garcia Abrego*, 141 F.3d at 152 (quoting *Cervantes-Pacheco*, 826 F.2d at 315).  Accordingly, the record in this case does not reveal any fundamental unfairness based on prosecutorial misconduct that would entitle him to habeas relief.  *See Barrientes*, 221 F.3d at 753 (citing *Foy*, 959 F.2d at 1317).

### 6.    Unconstitutional search and seizure

Franklin further argues in his Petition that the State violated the Fourth Amendment by introducing the two letters written by Yslas as trial exhibits and calling Yslas and Reskey to testify about these letters.  Pet. 33.  Franklin argues that these letters were "seized as the product of an unconstitutional search and seizure" in violation of *Mapp v. Ohio*, 367 U.S. 643 (1961).  Pet. 33.  Franklin also argues that this evidence was seized after a search "conducted without a warrant, probable cause, or good faith" in violation of *United States v. Leon*, 468 U.S. 897 (1984).

Franklin is not, however, entitled to federal habeas corpus relief on this basis.  As an initial matter, the Supreme Court held in *Stone v. Powell*, 428 U.S. 465 (1976), that when "the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, . . . a state prisoner [may not] be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Stone*, 428 U.S. at 482; *ShisInday v. Quarterman*, 511 F.3d 514, 524 (5th Cir. 2007); *Janecka*, 301 F.3d at 320.

The Fifth Circuit has interpreted the phrase, "'opportunity for full and fair litigation' to mean just that: 'an opportunity.'" *Janecka*, 301 F.3d at 320 (quoting *Caver v. Ala.*, 577 F.2d 1188, 1192 (5th Cir. 1978)). "If a state provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, *Stone v. Powell* bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes." *Id.* (quoting *Caver*, 577 F.2d at 1192). Where a criminal defendant is given opportunities to raise objections under the Fourth Amendment in pre-trial motions to suppress and on appeal, federal habeas relief is unavailable. *Id.* at 320-21.

As a general matter, the Texas courts have frequently been found to provide "sufficient opportunity to litigate [a state court defendant's] Fourth Amendment claim" for purposes of the limitation described in *Stone*. *See id.* at 320-22; *Moreno v. Dretke*, 450 F.3d 158, 167 (5th Cir. 2006); *Norman v. Thaler*, CIV.A. SA-12-CA-402, 2013 WL 2404116, at *1 (W.D. Tex. May 30, 2013). Here, Franklin makes no allegation that the Texas courts "routinely or systematically" failed to consider his Fourth Amendment claims at trial, and therefore Franklin cannot be granted habeas relief on this basis. *Moreno*, 450 F.3d at 167.

"The fact that [a state court defendant] failed to take advantage" of the opportunities afforded by a state's judicial system "does not render the *Stone* bar inapplicable to this claim" under the Fourth Amendment. *See Janecka*, 301 F.3d at 320. Therefore, the *Stone* bar must also apply to Franklin's claim. Franklin's attorney stated explicitly at trial that he would not make "an objection to the copy" of Yslas's first letter, which was provided to the State by Reskey and entered into evidence as State's Exhibit 10. *See* Tr. Vol. 3, at 128. Franklin's attorney did object to the introduction of Yslas's second letter on grounds of relevance, but made no mention of the Fourth Amendment. *Id.* at 207-12. The Fourth Amendment was briefly referenced in Franklin's

pre-trial motion for the return of property, but this motion referred only to items that were "not legal evidence seized by the State," such as Franklin's "hang-up bag," none of which ever introduced as trial exhibits. This motion did not mention either of the letters introduced at trial, and there is no indication that Franklin's attorney ever made any pre-trial motion to suppress either letter based on the Fourth Amendment. Finally, Franklin did not raise the Fourth Amendment during the appeal of his conviction. *See Franklin*, No. 08-08-00274-CR, at 3-5 (discussing Franklin's objections to the introduction of Yslas's letter only on grounds of hearsay and prejudicial "extraneous offense evidence").

Therefore, since Franklin has never attempted to take advantage of the opportunity to litigate his Fourth Amendment claims at any point, the introduction of Yslas's letters provides no grounds for Franklin to receive habeas relief. *See Janecka*, 301 F.3d at 320 (quoting *Caver*, 577 F.2d at 1192); *Moreno*, 450 F.3d at 167. Franklin has made no allegation that the State denied him this opportunity. *See Janecka*, 301 F.3d at 320 (citing *Williams v. Brown*, 609 F.2d 216, 220 (5th Cir. 1980)); *Moreno*, 450 F.3d at 167. Therefore, the Supreme Court's holding in *Stone* forecloses this Court from granting habeas relief based on Franklin's claims under the Fourth Amendment. *See Stone*, 428 U.S. at 482; *ShisInday*, 511 F.3d at 524.

### 7.      Ineffective assistance of counsel

Franklin also argues that "his constitutional rights under the Sixth Amendment were violated" when his attorney "fell below the professional norm in his representation of applicant," during both the merits phase and the sentencing phase as described in *Strickland v. Washington*, 466 U.S. 688 (1984). Pet. 36-40. Franklin raises a variety of grounds for his *Strickland* claim of ineffective assistance of counsel. *Id.* at 36-38. None of Franklin's arguments, however, entitle him to habeas relief.

Under the Sixth Amendment, "[t]he right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). To merit relief on an ineffective assistance of counsel claim, a petitioner must demonstrate both (1) his "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. at 687; *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994). A failure to establish either prong of this test requires a finding that counsel's performance was constitutionally effective. *See Strickland*, 466 U.S. at 687 ("Unless a defendant makes both showings, it cannot be said that the conviction or . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable."); *Armstead v. Scott*, 37 F.3d 202, 210 (5th Cir. 1994).

The test's performance prong centers on whether counsel's assistance was reasonable, considering all the circumstances at the time of counsel's conduct. *See Strickland*, 466 U.S. at 688. In order to obtain relief, a petitioner must establish "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. In assessing whether a particular counsel's performance was constitutionally deficient, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. La.*, 350 U.S. 91, 101 (1955)).

A deficiency in counsel's performance, even if professionally unreasonable, does not equal ineffective assistance of counsel; the petitioner must also demonstrate actual prejudice. *See id.* at 691-92. The test's prejudice prong requires the petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

41

would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

### a.  Failure to raise Sixth Amendment violations

First, Franklin argues that his attorneys provided him ineffective assistance by failing to "object properly by not using the Sixth Amendment violation with an emphasis on the confrontation clause and the compulsory process as the basis for admission of the discrediting testimony." Pet. 36.  As explained above, however, the trial court did not violate the Sixth Amendment when it excluded extrinsic testimony from Walid or the police officer regarding Yslas's previous accusations for the purpose of demonstrating Yslas's propensity for lying.  *See* Tr. Vol. 3, at 261.  Such evidence was precluded by the Texas Rules of Evidence and, as the Supreme Court has recently explained regarding Nevada's version of this same rule, "[t]he constitutional propriety of this rule cannot be seriously disputed." *See Jackson*, 133 S. Ct. at 1992-93.  As the Fifth Circuit has explained, "[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994).

Accordingly, the failure to raise this meritless objection was neither the result of deficient performance, nor prejudicial to Franklin.  *See Strickland*, 466 U.S. at 687; *Motley*, 18 F.3d at 1226.  Franklin therefore is not entitled to habeas relief on this basis.

### b.  Failure to object to prejudicial evidence of extraneous offenses

Second, Franklin argues that his attorneys "erroneously used the hearsay argument but should have used an extraneous offense objection" when the State introduced the letter written by Yslas after the alleged strangling, when the State "called witnesses to testify about this letter," and when a similar offense was referred to in the States' opening argument.  Pet. 36-37.

However, the trial court found explicitly that the letter did not refer to an extraneous

offense, but was written in "anticipation" of charges that Yslas may have filed regarding the

charged offense.  *See* Tr. Vol. 3, at 199-205.  When considering a habeas petition, the state

court's factual findings "shall be presumed to be correct" unless the petitioner discharges his

"burden of rebutting the presumption of correctness by clear and convincing evidence." 28

U.S.C. § 2254(e)(1).  Further, "[t]he presumption of correctness not only applies to explicit

findings of fact, but it also applies to those unarticulated findings which are necessary to the state

court's conclusions of mixed law and fact."  *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir.

2001).  Here, Franklin has not provided clear and convincing evidence that the trial court

misinterpreted the ambiguous letter dated November 6, 2007, or that the letter referred to a

previous alleged assault by Franklin against Yslas.  *See* Pet. 36-37.  Finally, the "extraneous

offense" referenced during the State's opening argument was in fact a predicate offense for the

offense with which Franklin was charged under the Texas Penal Code.  *See* Tr. Vol. 3, at 7-9; *see

also* Tex. Penal Code § 22.01(b)(2)(A) (Vernon 2007).  Far from being prejudicial, therefore,

this evidence was probative of an essential element of Franklin's offense.  Accordingly, the

record does not reveal any prejudice was caused by the discussion of any extraneous offense

during trial, nor that the performance of Franklin's counsel was deficient.  *See Galvan v.

Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002).

### c.  Failure to raise Fourth Amendment violation

Third, Franklin argues that his attorneys should have raised a Fourth Amendment

violation at trial or in a pre-trial motion to suppress the copy of the letter written after the alleged

strangling because, as Franklin alleges, the letter was obtained through an unconstitutional search

and seizure.  Pet. 36-37.  The physical copy of the letter itself, however, played a very minor role

in the State's case against Franklin.  Even had the copy been suppressed, both Reskey and Yslas

would still have been permitted to testify about their recollection of the circumstances surrounding the writing of this letter.  The jury would have learned from Reskey's testimony that Franklin "told [Yslas] to write a letter" and "told her what to put in the letter," and this would have been confirmed by Yslas's identical testimony.  Tr. Vol. 3, at 117, 125, 200-01. Accordingly, whatever the merits of Franklin's objection on Fourth Amendment grounds may have been, this objection would not have changed the outcome of Franklin's trial, and thus no prejudice was caused by the admission of the copy of the letter at trial.  *See Galvan*, 293 F.3d at 764.  The performance of Franklin's counsel therefore was not deficient based on the admission of the physical copy of the letter.  *See Galvan*, 293 F.3d at 764.

### d.    Failure to investigate

Fourth, Franklin also argues that his attorneys failed to investigate "the reason why . . . Yslas changed her testimony after signing a non-prosecution affidavit," the circumstances surrounding "improper coaching by prosecution of complainant Yslas and witness Ray Reskey," and "what actually happened with . . . photos of injuries," and "how the State prosecutors ended up with [Franklin's] personal property."  Pet. 37.  However, "a defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial."  *Druery v. Thaler*, 647 F.3d 535, 541 (5th Cir. 2011) (quoting *Nelson v. Hargett*, 989 F.2d 847, 850 (5th Cir. 1993)).

Here, whatever further investigation would have revealed, it is unlikely that further impeachment of Yslas and Reskey would have altered the outcome of the trial, because the testimony at trial by Aleman, Officer Clifford, and Officer Vega corroborated the trial testimony by Yslas and Reskey that the marks on Yslas's neck were not hickeys, but impressions left by fingers.  *See* Tr. Vol. 3, at 35-36, 77, 291.  Moreover, Franklin fails to allege with specificity

what the investigation into the deletion of the photographs and the seizure of Franklin's personal property would have revealed.  *See* Pet. 36-37.  As already discussed above, none of the trial testimony suggested that the photographs would have shown hickeys.  *See* Tr. Vol. 3, at 35-36, 77, 291.  Yslas's two letters also added very little to the States' case, given the consistent testimony regarding Reskey and Yslas regarding the circumstances of its creation.  *See* Tr. Vol. 3, at 117, 125, 200-01.  Therefore, since Franklin fails to allege with specificity how these investigations would have altered the outcome of his trial, there is no basis for a finding of ineffective assistance of counsel on this basis.  *See Druery*, 647 F.3d at 541; *Nelson*, 989 F.2d at 850.

### e.        Failure to present mitigating evidence

Finally, Franklin argues that his attorney failed to present mitigating evidence or favorable character witnesses during sentencing.  *Id.* at 39-40.  When assessing the prejudice caused by counsel's failure to present potentially mitigating evidence, this Court must "reweigh the evidence in aggravation against the totality of available mitigating evidence."  *Miller v. Dretke*, 420 F.3d 356, 364 (5th Cir. 2005).  In the present context, the relevant inquiry is whether, absent counsel's errors, there is a reasonable probability that the defendant's sentence would have been "significantly less harsh."  *Dale v. Quarterman*, 553 F.3d 876, 880-81 (5th Cir. 2008).  Although federal habeas courts in the Fifth Circuit no longer use the "significantly less harsh standard" in reviewing federal proceedings, this standard remains applicable to state sentencing proceedings.  *Id.* (analyzing *United States v. Grammas*, 376 F.3d 433, 438 & n.4 (5th Cir. 2004) and *Spriggs v. Collins*, 993 F.2d 85, 88-89 (5th Cir. 1993)).  The habeas court must consider "'such factors as the defendant's actual sentence, the potential minimum and maximum sentences that could have been received, the placement of the actual sentence within the range of

potential sentences, and any relevant mitigating or aggravating circumstances.'"  *Id.* (citing *United States v. Segler*, 37 F.3d 1131, 1136 (5th Cir. 1994)).

Here, Franklin was sentenced to forty years in prison based on his conviction for "assault family violence" against Yslas, with whom he was in a dating relationship, his previous felonies in Texas, Colorado, and Arkansas, and substantial testimony that he had assaulted Yslas on numerous occasions in the past.  *See* Tr. Vol. 4, at 172-208; *id.* Vol. 5, at 1-94, 124-26.  Although Franklin calls his sentence of forty years "an extremely harsh sentence," he does not contest the State's contention that forty years constitutes "a midrange punishment" based on the Texas Penal Code and the enhancements applicable based on Plaintiff's criminal history.  *Compare* Pet. 38, *with* Resp. 30; *see also Guerrero v. Thaler*, A-11-CA-462-SS, 2011 WL 2421067, at *1 (W.D. Tex. June 13, 2011) (explaining that "Petitioner was subsequently convicted of assault family violence and sentenced to 65 years in prison" after "his 1999 conviction was used to enhance his 2010 conviction"); *Johnson v. Thaler*, 309-CV-1525-D, 2010 WL 3359608, at *1 (N.D. Tex. July 19, 2010) (explaining that "Petitioner was sentenced to forty-five years confinement" after "his conviction for assault—family violence, enhanced by two prior felony convictions"), *report and recommendation adopted*, 3:09-CV-1525-D, 2010 WL 3359605 (N.D. Tex. Aug. 20, 2010).

Franklin's only argument relating to the length of his sentence is that he received ineffective assistance of counsel based on his attorney's failure to call any witnesses to present mitigating testimony.  *See* Pet. 39-40.  Although Franklin refers to "several positive witnesses of outstanding character" that would have testified "favorably on his behalf," Franklin does not name these individuals, provide any affidavit testimony from such individuals, or indicate with specificity what they would have said.  *See id.*  However, a habeas petitioner who alleges a

46

failure to investigate mitigating evidence must state with specificity what the investigation would have revealed and how it would have changed the outcome of his trial. *See Miller*, 420 F.3d at 361 (citing *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)); *Casas v. Quarterman*, CIV A H-05-3449, 2007 WL 837198, at *10 (S.D. Tex. Mar. 15, 2007). In *Dale v. Quarterman*, the Fifth Circuit held that affidavits describing the petitioner to be "of good character" did not raise a reasonable probability that the defendant's sentence would have been "significantly less harsh" because such affidavits were "conclusory." *Dale*, 553 F.3d at 880-81. These affidavits did "not provide any specific facts describing Dale's good character or good action, nor . . . reveal whether the affiant has had timely, recurring contact with and familiarity with Dale." *Id.* Accordingly, the Fifth Circuit affirmed the district court's denial of habeas relief. *Id.*

Here, Franklin also fails to provide any specific facts or state with specificity what testimony would have been offered "on his behalf" by the "positive witnesses of outstanding character" that he describes. *See Miller*, 420 F.3d at 361; *Dale*, 553 F.3d at 880-81; *Casas*, 2007 WL 837198, at *10. As Franklin has described his potential mitigating evidence, therefore, this Court cannot grant Franklin habeas relief based on his attorney's failure to present this evidence at sentencing.

### 8.    Actual innocence

Finally, Franklin argues that he is entitled to habeas relief because he is actually innocent of the offense for which he was convicted. Pet. 41-43. However, as decisions by the Supreme Court and the Fifth Circuit confirm, actual innocence is not an independently cognizable basis for habeas relief. *Herrera v. Collins*, 506 U.S. 390, 400; *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006); *Dowthitt v. Johnson*, 230 F.3d 733, 741-42 (5th Cir. 2000); *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003). This Court therefore cannot grant habeas relief on

Franklin's behalf on this basis.

## III.   EVIDENTIARY HEARING

In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

Given that Franklin has pointed to no potential evidence in support of his claims, the Court holds that an evidentiary hearing is unnecessary in this case. *See United States v. Demik*, 489 F.3d 644, 646 (5th Cir. 2007); *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998); *United States v. Plewniak*, 947 F.2d 1284, 1290 (5th Cir. 1991).

## IV.   CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, effective December 1, 2009, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*

In this case, reasonable jurists could not debate the denial of Franklin's federal petition

for writ of habeas corpus on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed.  *See Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484).  Accordingly, a certificate of appealability shall not be issued.

## V.      CONCLUSION

For the reasons set forth above, Franklin's Petition for Writ of Habeas Corpus, ECF No. 1, is **DENIED**.  Additionally, a certificate of appealability is **DENIED** in Franklin's case.

The clerk shall close this case.

**SO ORDERED**.

SIGNED this 19th day of July, 2013.


KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE